## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DC MEDICAL, LLC,

       Case No.

      Plaintiff

v.           **INJUNCTIVE RELIEF REQUESTED**

MICHAEL DOMSON, ASPETTO MEDICAL DEVICES, LLC, AND ZIMMER, INC. d/b/a ZIMMER BIOMET,

      Defendants.     /

_____

## **COMPLAINT**

Plaintiff DC Medical, LLC, files this action against Defendants Michael Domson ("Domson"), Aspetto Medical Devices, LLC ("Aspetto"), and Zimmer, Inc. d/b/a Zimmer Biomet ("Zimmer") alleging as follows:

## **NATURE OF THE CASE**

1.    This is an action to enforce DC Medical's contractual and common law rights. DC Medical seeks preliminary equitable relief against Domson, its former sales representative and Senior Team Lead, and Aspetto (Domson's business) (collectively referred to as the "Domson Defendants") for blatant and repeated violations of their Sales Representative Agreement (the "Agreement") with DC Medical. A true and correct copy of the Agreement is attached hereto as Exhibit A.

1

2.     DC Medical also seeks equitable relief against Zimmer, a direct competitor that engaged and thereafter induced the Domson Defendants to breach their contractual obligations to unfairly compete and divert sales to Zimmer.

3.     The Domson Defendants agreed that any disputes arising out of or relating to the enforcement of the Agreement shall be resolved in arbitration pursuant to the American Arbitration Association ("AAA") Commercial Arbitration Rules. *See* Agreement, § 10.2.

4.     Zimmer can properly be joined as a party to arbitration because DC Medical's claims against Zimmer are based on the same set of operative facts as those against the Domson Defendants. *See Marcus v. Florida Bagels, LLC*, 112 So. 3d 631, 633-34 (Fla. 4th DCA 2013).

5.     The Agreement allows the parties to seek a judicial temporary restraining order, preliminary injunction, or other similar short-term equitable relief in court, and doing so does not constitute a waiver of DC Medical's right to arbitration. *See* Agreement, § 10.3.

6.     As such, DC Medical is filing this Complaint for injunctive relief only and will be contemporaneously filing a demand for arbitration with AAA.

## PARTIES, JURISDICTION, AND VENUE

7.     DC Medical is a Georgia limited liability company, and its principal place of business is located in Georgia. Its sole member, Tom Dolan (an individual), is also a Georgia citizen.

8.     Defendant Domson is a citizen of the State of Florida. He can be served with process at his residence, 609 Lotus Lane, Sarasota, Florida 34242.

9.     Defendant Aspetto is a Florida limited liability company, and its principal place of business is in Florida. Upon information and belief, Domson is Aspetto's sole member/owner. Aspetto can be served with process by delivering the Complaint to its registered agent, Michael Domson, 609 Lotus Lane, Sarasota, FL 34242.

10.    Defendant Zimmer is a Delaware corporation that maintains its principal place of business in Warsaw, Indiana. It can be served with process by delivering the Complaint to its registered agent, Corporation Service Company, 201 Hayes Street, Tallahassee, FL 32301-2525.

11.    This Court has personal jurisdiction over defendants because Domson is a Florida citizen, Aspetto is a Florida limited liability company and its sole member is a Florida citizen, and Zimmer regularly engages in business activities in Florida. In addition, the claims in this action arise from and are directly related to Defendants' activities in Florida.

12.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in this judicial district, Domson resides in this judicial district, and Defendants are engaging in unlawful conduct in this judicial district.

## FACTUAL ALLEGATIONS

14.     DC Medical is an exclusive representative of Depuy Synthes, which is part of the Johnson & Johnson MedTech family of companies, one of the three major global manufacturers of medical devices.

15.     DC Medical sells and distributes a wide range of orthopedic devices on behalf of Depuy Synthes and Johnson & Johnson MedTech, including total joint replacement devices like artificial knees and hips.

16.     DC Medical retains sales representatives as independent contractors to promote and sell these devices.

17.     Sales representatives must have in-depth product knowledge and build strong relationships with healthcare providers to be successful.

18.    Sales representatives do not just promote medical devices; they regularly accompany physicians to the operating room and instruct orthopedic surgeons and operating room staff on how to use the products during actual surgeries.

### The Domson Defendants Engagement With DC Medical

19.    DC Medical retained Domson (directly and through his independent business, Aspetto) as a sales representative on January 1, 2014.

20.    On behalf of DC Medical, Domson was responsible for selling the Attune System product (a knee replacement device), the Actis Hip Stem device, Emphasys Acetabular Cup, and the Extremity products, including INHANCE, shoulder devices, as well as other Depuy Synthes/Johnson & Johnson MedTech products.

21.    Eventually, Domson became a Senior Team Lead and was responsible for overseeing the work of several subordinate sales representatives contracting with DC Medical.

22.    Domson and his team were responsible for the sales territory encompassing certain locations/medical facilities along the West Coast of Florida, and in and around the city of Sarasota.

23.    To effectively represent DC Medical and the devices it sells on behalf of Depuy Synthes and Johnson & Johnson MedTech, Domson gained a comprehensive and detailed understanding of the features and benefits of the

5

orthopedic devices for which he and his team were responsible, including a particular product's design, attributes, and recommended best practices for surgical implantation – proprietary information that is confidential and that would be invaluable to a manufacturer selling or distributing a competitive product.

24.    By virtue of his role as a sales representative, Domson obtained confidential business information about the specific design and use cases for the products he sold (mentioned above) and how they compare to similar products manufactured and sold by competitors.

25.    With this knowledge in hand and by way of example, Domson and his team sold and attended the application of the Attune System in 299 surgeries in the year preceding his decision to terminate his contract with the Company – more than one each weekday. This work included providing guidance to surgeons and operating room professionals on the device's attributes and manufacturer-recommended best practices before and during surgery.

26.    Domson learned the myriad of surgical instruments that can be used to apply the Attune System to patients, and he advised operating room staff on which instruments to prepare and have ready for surgeries based upon the knowledge he gained – through his work on behalf of DC Medical – regarding the device's characteristics, individual surgeon's techniques and preferences, and patient sizing and fit requirements.

6

27.    In addition to learning the confidential and proprietary business information surrounding the orthopedic devices he sold and the preferences of the Company's customers, DC Medical provided Domson with the benefit of its longstanding customer goodwill, customer access, and customer knowledge. Mr. Domson would not have had such information and access to customers without being engaged by DC Medical.

28.    Domson learned and relied on his detailed understanding of the Company's day-to-day operations, strategic growth plans, and internal compensation and external pricing policies and practices. He was entrusted with highly valuable internal information and strategies that, if shared externally and particularly with competitors, would cause substantial harm to DC Medical.

29.    Among other things, a competitor could easily use such information to seamlessly intercept the use of DC Medical's devices in surgical procedures in favor of a comparable device from a different manufacturer, essentially cutting off DC Medical's revenue source from a particular physician/provider and redirecting that income to a competitor.

30.    A physician's decision to use one device over another turns almost exclusively on his or her relationship with a sales representative, the sales representative's access to the physician, knowledge of the physician's techniques and practices, and the sales representative's ability to distinguish between design

attributes of comparable devices and recommend the "preferred" device for a given procedure.

**The Domson Defendants' Sales Representative Agreement**

31.    All of DC Medical's sales representatives execute a Sales Representative Agreement on an annual basis.

32.    These agreements set forth the terms of engagement with DC Medical and contain restrictive covenants.

33.    The Domson Defendants executed the Agreement (Exhibit A) in late December 2023, governing Domson's work for calendar year 2024.

34.    The Agreement contains non-competition, non-solicitation, and confidentiality provisions.

35.    In relevant part, the Agreement's non-competition provisions prohibit the Domson Defendants from: "for a period of 24 months following the termination or expiration of th[e] Agreement for any reason, [from engaging in] Competitive Activities within a 10-mile radius of any hospital, clinic, or other medical facility [listed in the Agreement or any facility at which they] provided services during the 24-months prior to the termination of the . . . relationship with the Company . . ." Agreement, §3.2.

36.    The Agreement specifies that "Competitive Activities" are: "limited to selling, offering for sale, promoting, receiving or soliciting orders for (or similar or

related activities) only products and services similar to or competitive with those that were offered, promoted, sold or for which orders were received or solicited by [the Domson Defendants] . . . during the 24-months prior to the termination of the . . . relationship with the Company . . ." Agreement, §3.2.

37.     During the last 24 months of the Domson Defendants' engagement with DC Medical, they promoted, solicited, and sold: knee products (*e.g.* the Attune System); hip products; extremity products (*i.e.* shoulders); related operating room products; bone cement and accessories; and VELYS Robotics Assisted Solutions.

38.     The Agreement's non-solicitation provisions restrict the Domson Defendants, "for a period of 24 months following the termination or expiration of the Agreement for any reason," from engaging in "Solicitation Activities," which means: "to solicit or attempt to solicit, directly or by assisting others, any customer (including, without limitation, any ordering physician) of the Company or DePuy Synthes (including, without limitation, actively sought prospective customers) with whom [the Domson Defendants] had material business contact, [or] supervised the activities of others having material business contact . . ." Agreement, §3.3.

39.     Solicitation Activities are also limited to the same products as those identified in the non-compete provision above.

40.     The Agreement also has confidentiality provisions to protect "information possessed from time to time by [the Domson Defendants] that relates

9

to the Company's or DePuy Synthes' business and that has value to the Company or Depuy Synthes . . . and is not generally known to the public, including without limitation . . . customer lists, account history information, customer preferences . . . [and] inventory systems and processes . . ." Agreement, § 3.15.

41.    The Agreement requires Domson to hold such information "in confidence" and forbids him from disclosing it outside of the Company, consistent with applicable law.

### The Domson Defendants Leave DC Medical And Join Zimmer

42.    The Domson Defendants terminated their contract with DC Medical on April 4, 2024.

43.    They then contracted with Zimmer in a sales representative role that is functionally equivalent – if not virtually identical – to their former role with DC Medical.

44.    Zimmer is a direct competitor of DC Medical, DePuy Synthes, and Johnson & Johnson MedTech; it manufactures and distributes, for example, the "Persona" line of partial and total knee replacement devices, as well as other directly competitive products involving hips and shoulders.

45.    On information and belief, at all relevant times, Zimmer had knowledge that Domson was subject to certain restrictive covenants following the termination of his engagement with DC Medical.

46.    Approximately thirteen months into the 24-month non-competition and non-solicitation periods set forth in the Agreement, on May 7, 2025, Domson participated in a surgical procedure as a Zimmer sales representative at the Musculoskeletal Ambulatory Surgery Center.

47.    On that day, Domson signed into the Center's logbook using only his first name, "Mike," and indicated that he was visiting the Center as a representative of "ZB" (*i.e.* Zimmer Biomet); Domson then attended a surgical procedure with Dr. Stephen Otte.

48.    The Musculoskeletal Ambulatory Surgery Center is a location where the Domson Defendants provided services during the 24 months prior to the termination of their engagement with DC Medical, and it is specifically identified in the Agreement as a location where the Domson Defendants are prohibited from engaging in competitive activities pursuant to Section 3.2 of the Agreement.

49.    The Musculoskeletal Ambulatory Surgery Center is a customer of DC Medical, and Dr. Stephen Otte is a representative of the Center and an ordering physician with whom Domson had material business contact during the last 24 months of his engagement with DC Medical. As such, Dr. Otte (and the Musculoskeletal Ambulatory Surgery Center generally) are among the ordering physicians and customers subject to the non-solicitation provisions set forth in Section 3.3 of the Agreement.

50.    Upon learning of the above conduct, DC Medical had its outside counsel send a letter to Domson reminding him of his contractual obligations under the Agreement, and that any violation of the Agreement could lead to legal action.

51.    The letter was sent to Domson via FedEx to his home address on May 27, 2025 and delivered the next day.

**The Domson Defendants Violate The Agreement On October 1, 2025**

52.    The Domson Defendants appeared to remain quiet for several months after receiving the letter, but on October 1, 2025, Domson visited the Musculoskeletal Ambulatory Center again.

53.    On that day, Domson visited the Center as a Zimmer sales representative, signing into the Center's logbook as "M. Domson," and indicated that he was at the facility on behalf of "ZB" (*i.e.* Zimmer Biomet) to visit the "OR" (*i.e.* operating room).

54.    During his October 1 visit, Domson interacted with Dr. Alan Valadie, who holds a leadership position at the Center, and discussed hip replacement products.

55.    The Musculoskeletal Ambulatory Surgery Center is a customer of DC Medical, and Dr. Valadie is a representative of the Center and an ordering physician with whom Domson had material business contact during the last 24 months of his engagement with DC Medical. As such, Dr. Valadie (and the Musculoskeletal

Ambulatory Surgery Center generally) are among the ordering physicians and customers subject to the non-solicitation provisions set forth in Section 3.3 of the Agreement.

56.    Indeed, Domson worked extensively with Dr. Valadie while he was with DC Medical, including discussing DC Medical's current and prospective confidential business plans with the Center, such as setting a future pricing and rebate structure agreement for medical device implants, as well as capital acquisition models for the purchase of surgical robot tools at the Center.

57.    While at the Center on October 1, Domson was overheard discussing total hip replacement products with Dr. Valadie on behalf of Zimmer.

58.    Hip replacement products are among those that Domson solicited and sold during the last 24 months of his engagement with DC Medical.

59.    Based on the above, Domson was engaging in "Competitive Activities" and "Solicitation Activities" on October 1 in violation of the Agreement.

60.    Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 1, and that those activities violated Domson's restrictive covenants.

**The Domson Defendants Violate The Agreement Twice On October 8, 2025**

61.    On October 8, 2025, Domson visited the Premier Surgery Center of Sarasota (formerly the Surgery Center at University Park) as a Zimmer sales

representative.

62.    The Premier Surgery Center is a location where the Domson Defendants provided services during the 24 months prior to the termination of their engagement with DC Medical, and it is specifically identified in the Agreement as a location where the Domson Defendants are prohibited from engaging in competitive activities pursuant to Section 3.2 of the Agreement.

63.    During his October 8 visit to the Center, Domson met with Dr. Jeffrey Silverstein in the Center's lounge; Domson thereafter accompanied Dr. Silverstein to an operating room for a knee replacement procedure.

64.    The Premier Surgery Center is a customer of DC Medical, and Dr. Silverstein is a representative of the Center and an ordering physician with whom Domson had material business contact during the last 24 months of his engagement with DC Medical. As such, Dr. Silverstein (and the Premier Surgery Center generally) are among the ordering physicians and customers subject to the non-solicitation provisions set forth in Section 3.3 of the Agreement.

65.    While Domson was in the operating room with Dr. Silverstein on October 8, he assisted with the implantation of a Zimmer "Persona" knee replacement device.

66.    Knee replacement devices are among those that Domson solicited and sold during the last 24 months of his engagement with DC Medical.

67.     Based on the above, Domson was engaging in "Competitive Activities" and "Solicitation Activities" at the Premier Surgery Center on October 8 in violation of the Agreement.

68.     Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 8, and that those activities violated Domson's restrictive covenants.

69.     Domson also visited the Lakewood Ranch Medical Center as a Zimmer sales representative on October 8, 2025.

70.     The Lakewood Ranch Medical Center is a location where the Domson Defendants provided services during the 24 months prior to the termination of their engagement with DC Medical, and it is specifically identified in the Agreement as a location where the Domson Defendants are prohibited from engaging in competitive activities pursuant to Section 3.2 of the Agreement.

71.     During the visit on October 8, Domson engaged with Dr. William Mahoney and accompanied Dr. Mahoney to the operating room for a knee replacement procedure.

72.     The Lakewood Ranch Medical Center is a customer of DC Medical, and Dr. Mahoney is a representative of the Center and an ordering physician with whom Domson had material business contact during the last 24 months of his engagement with DC Medical. As such, Dr. Mahoney (and the Lakewood Ranch

15

Medical Center generally) are among the ordering physicians and customers subject to the non-solicitation provisions set forth in Section 3.3 of the Agreement.

73.     While in the operating room with Dr. Mahoney on October 8, Domson assisted with the implantation of a Zimmer Persona knee replacement device.

74.     Based on the above, Domson was engaging in "Competitive Activities" and "Solicitation Activities" at the Lakewood Ranch Medical Center on October 8 in violation of the Agreement.

75.     Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 8, and that those activities violated Domson's restrictive covenants.

**The Domson Defendants Violate The Agreement On October 16, 2025**

76.     Domson visited the Lakewood Ranch Medical Center as a Zimmer sales representative again on October 16, 2025.

77.     During his visit on October 16, Domson met with Dr. Mahoney and accompanied Dr. Mahoney to the operating room for a knee replacement procedure.

78.     During the procedure, Domson assisted Dr. Mahoney with the implantation of a Zimmer Persona knee replacement device.

79.     Based on the above, Domson was engaging in "Competitive Activities" and "Solicitation Activities" at the Lakewood Ranch Medical Center on October 16 in violation of the Agreement.

80.    Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 16, and that those activities violated Domson's restrictive covenants.

### The Domson Defendants Violate The Agreement On October 21, 2025

81.    On October 21, 2025, Domson visited the Doctors Hospital of Sarasota as a Zimmer sales representative.

82.    The Doctors Hospital of Sarasota is a location where the Domson Defendants provided services during the 24 months prior to the termination of their engagement with DC Medical, and it is specifically identified in the Agreement as a location where the Domson Defendants are prohibited from engaging in competitive activities pursuant to Section 3.2 of the Agreement.

83.    During the visit on October 21, Domson with Dr. John Thomas, and he accompanied Dr. Thomas to the operating room for a knee replacement procedure.

84.    The Doctors Hospital of Sarasota is a customer of DC Medical, and Dr. Thomas is a representative of the Hospital and an ordering physician with whom Domson had material business contact during the last 24 months of his engagement with DC Medical. As such, Dr. Thomas (and the Doctors Hospital of Sarasota generally) are among the ordering physicians and customers subject to the non-solicitation provisions set forth in Section 3.3 of the Agreement.

17

85.     During the procedure on October 21, Domson assisted Dr. Thomas with the implantation of a Zimmer "Persona" knee replacement device.

86.     Based on the above, Domson was engaging in "Competitive Activities" and "Solicitation Activities" at the Doctors Hospital of Sarasota on October 21 in violation of the Agreement.

87.     Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 21, and that those activities violated Domson's restrictive covenants.

88.     While he was at the facility on October 21, Domson spoke to Ryan McGarry, a DC Medical sales representative.

89.     During that conversation, McGarry questioned Domson about his presence at the facility given Domson's non-compete and non-solicitation agreements with DC Medical; and in response, Domson told McGarry that his non-compete and non-solicitation obligations only extended for a period of 18 months after the termination of his engagement with DC Medical. He was wrong, as demonstrated by the Agreement (Exhibit A).

**The Domson Defendants Violate The Agreement On October 22, 2025**

90.     On October 22, 2025, Domson visited the Premier Surgery Center as a Zimmer representative and participated in another knee replacement procedure with Dr. Silverstein.

91.     During the procedure, Domson assisted Dr. Silverstein with the implantation of a Zimmer "Persona" knee replacement device.

92.     Based on the above, Domson was engaging in "Competitive Activities" at the Premier Surgery Center on October 22 in violation of the Agreement.

93.     Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 22, and that those activities violated Domson's restrictive covenants.

**The Domson Defendants Violate The Agreement On October 23, 2025**

94.     On October 23, 2025, Domson visited the Lakewood Ranch Medical Center as a Zimmer representative and participated in another knee replacement procedure with Dr. Mahoney.

95.      During the procedure, Domson assisted Dr. Mahoney with the implantation of a Zimmer "Persona" knee replacement device.

96.     Based on the above, Domson was engaging in "Competitive Activities" at the Lakewood Ranch Medical Center on October 23 in violation of the Agreement.

97.     Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 23, and that those activities violated Domson's restrictive covenants.

**The Domson Defendants Violate The Agreement On October 24, 2025**

98.    On October 24, 2025, Domson visited the Doctors Hospital of Sarasota as a Zimmer representative and, upon information and belief, attended a procedure in the operating room where he assisted with the implantation of a Zimmer knee replacement device.

99.    As such, Domson was engaged in "Competitive Activities" at the Doctors Hospital of Sarasota on October 24 in violation of the Agreement.

100.    Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 24, and that those activities violated Domson's restrictive covenants.

101.    During his visit on October 24, Domson also engaged in conversation with Dr. Dan Lamar.

102.    The Doctors Hospital of Sarasota is a customer of DC Medical, and Dr. Lamar is a representative of the Center and an ordering physician with whom Domson had material business contact during the last 24 months of his engagement with DC Medical. As such, Dr. Lamar (and the Doctors Hospital of Sarasota generally) are among the ordering physicians and customers subject to the non-solicitation provisions set forth in Section 3.3 of the Agreement.

103.    In 2023, for example, the Domson Defendants and their team of sales representatives solicited approximately $311,220 in orders from Dr. Lamar for

Depuy Synthes and Johnson & Johnson MedTech hip replacement products from DC Medical.

104.   Shortly after the Domson Defendants terminated their agreement with DC Medical, Dr. Lamar transferred all of his business from DC Medical to Zimmer, and Domson is now soliciting orders from Dr. Lamar for Zimmer knee and hip replacement devices.

105.   Domson's conduct with respect to Dr. Lamar constitutes "Competitive Activities" and "Solicitation Activities" in violation of the Agreement.

106.   Zimmer had knowledge that Domson solicited sales from Dr. Lamar on behalf of Zimmer, and that Dr. Lamar was an ordering physician with whom Domson had frequent material business contact through his engagement with DC Medical.

107.   DC Medical's damages as a result of Domson's conduct, without limitation and based upon the sole example of Dr. Lamar/Doctor's Hospital of Sarasota, exceed $75,000. Further, the value of future lost sales from Domson's activities is well in excess of $75,000.

**The Domson Defendants Violate The Agreement On October 28, 2025**

108.   On October 28, 2025, Domson visited the Doctors Hospital of Sarasota as a Zimmer representative and attended another surgical procedure with Dr. Silverstein.

109.   During the procedure on October 28, Domson assisted Dr. Silverstein with the implantation of a Zimmer dynamic hip screw medical device.

110.   Based on the above, Domson was engaging in "Competitive Activities" at the Doctors Hospital of Sarasota on October 28 in violation of the Agreement.

111.   Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on October 28, and that those activities violated Domson's restrictive covenants.

**The Domson Defendants Violate The Agreement on November 4, 2025**

112.   On November 4, 2025, Domson visited the Doctors Hospital of Sarasota as a Zimmer representative and assisted Dr. Thomas with the implantation of a Zimmer knee replacement device.

113.   Based on the above, Domson was engaging in "Competitive Activities" at the Doctors Hospital of Sarasota on November 4 in violation of the Agreement.

114.   Upon information and belief, Zimmer had knowledge that Domson was engaging in business-related activities on its behalf at the above facility on November 4, and that those activities violated Domson's restrictive covenants.

115.   DC Medical has suffered lost revenue as a result of the Domson Defendants competitive activities and solicitation activities above.

116. The Domson Defendants' competitive activities and solicitation activities have also caused irreparable damage to DC Medical's business relationships with the above-referenced facilities and physicians.

117. Domson engaged in the above competitive activities and solicitation activities in the presence of other sales representatives engaged with DC Medical who have knowledge of Domson's non-compete and non-solicitation obligations to DC Medical (McGarry being one example), which has damaged DC Medical's reputation by undermining the validity of its agreements with other sales representatives.

118. Upon information and belief, at all relevant times, Zimmer had knowledge that the Domson Defendants were subject to restrictive covenants following termination of their engagement with DC Medical.

119. Upon information and belief, Zimmer never took any action(s) to ensure that the Domson Defendants adhered to their contractual obligations to DC Medical.

120. Upon information and belief, Zimmer knew that the Domson Defendants were engaging business activities on its behalf in violation of their non-compete and non-solicitation obligations to DC Medical.

121. The Domson Defendants' violations of their contractual obligations above have caused DC Medical actual damage and irreparable harm including, but

not limited to, loss of customer relationships, loss of goodwill, damage to reputation, lost sales and lost potential profits. The monetary value of these damages is impossible to calculate, and DC Medical has no adequate remedy at law or other means to address such injuries other than an award of injunctive relief.

122.　DC Medical will continue to suffer such irreparable injury unless the Court immediately enjoins Defendants from engaging in the above unlawful conduct.

123.　DC Medical therefore seeks equitable and, thereafter, injunctive relief to enjoin the Defendants' conduct and prevent further irreparable damage to DC Medical pending its arbitration of those disputes with the AAA. The specific nature of injunctive relief requested is fully set forth in DC Medical's contemporaneously filed Motion for Temporary Restraining Order and Preliminary Injunction and Proposed Temporary Restraining Order.

## COUNT I – BREACH OF CONTRACT
### (Against the Domson Defendants)

124.　DC Medical reasserts the preceding allegations as if fully set forth herein.

125.　The Domson Defendants voluntarily entered into the Agreement in consideration for compensation, receipt of confidential information, goodwill, and other benefits of their engagement with DC Medical.

126.   The Agreement's post-termination restrictive covenants set forth above (and as provided in Sections 3.2 and 3.3 of the Agreement) are reasonably necessary to protect DC Medical's legitimate business interests, including, but not limited to: valuable confidential business or professional information that otherwise does not qualify as trade secrets; substantial relationships with prospective or existing customers, patients or clients; and customer goodwill associated with a specific geographic location or a specific marketing or trade area.

127.   The Agreement's post-termination non-competition provision set forth above (and as provided in Sections 3.2 of the Agreement) is reasonable in time (two years); geographic scope (a 10-mile radius of the locations identified in the Agreement and where the Domson Defendants promoted and sold products for DC Medical in the last 24 months of their engagement); and line of business (devices the Domson Defendants promoted and sold during the last 24 months of their engagement with DC Medical, which includes: knee products (*e.g.* the Attune System); hip products; extremity products (*i.e.* shoulders); related operating room products; bone cement and accessories; and VELYS Robotics Assisted Solutions). As such, the non-compete provision set forth in Section 3.2 of the Agreement is valid and enforceable.

128.   The Agreement's post-termination non-solicitation provision set forth above (and as provided in Sections 3.3 of the Agreement) is reasonable in time (two

years); scope (customers and prospective customers, including ordering physicians, with whom the Domson Defendants had material business contact within the last 24 months of their engagement with DC Medical); and line of business (devices the Domson Defendants promoted and sold during the last 24 months of their engagement with DC Medical, which includes: knee products (*e.g.* the Attune System); hip products; extremity products (*i.e.* shoulders); related operating room products; bone cement and accessories; and VELYS Robotics Assisted Solutions). As such, the non-solicitation provision set forth in Section 3.3 of the Agreement is valid and enforceable.

129.   On October 1, 2025, the Domson Defendants engaged in "Competitive Activities" and "Solicitation Activities" in violation of the Agreement.

130.   On October 8, 2025, the Domson Defendants engaged in "Competitive Activities" and "Solicitation Activities" in violation of the Agreement.

131.   On October 16, 2025, the Domson Defendants engaged in "Competitive Activities" and "Solicitation Activities" in violation of the Agreement.

132.   On October 21, 2025, the Domson Defendants engaged in "Competitive Activities" and "Solicitation Activities" in violation of the Agreement.

133.   On October 22, 2025, the Domson Defendants engaged in "Competitive Activities" in violation of the Agreement.

134.   On   October   23,   2025,   the   Domson   Defendants   engaged   in "Competitive Activities" in violation of the Agreement.

135.   On   October   24,   2025,   the   Domson   Defendants   engaged   in "Competitive Activities" in violation of the Agreement.

136.   On   October   28,   2025,   the   Domson   Defendants   engaged   in "Competitive Activities" in violation of the Agreement.

137.   On   November   4,   2025,   the   Domson   Defendants   engaged   in "Competitive Activities" in violation of the Agreement.

138.   Upon information and belief, the Domson Defendants engaged in other conduct in violation of the Agreement in addition to that set forth above, the details of which are not yet fully known.

139.   The Domson Defendants' violations of their contractual obligations above have caused DC Medical actual damage and irreparable harm including, but not limited to, loss of customer relationships, loss of goodwill, damage to reputation, lost sales and lost potential profits. The monetary value of these damages is impossible to calculate, and DC Medical has no adequate remedy at law or other means to address such injuries other than an award of injunctive relief.

140.   DC Medical will continue to suffer such irreparable injury unless the Court immediately enjoins the Domson Defendants from engaging in the above unlawful conduct.

141. DC Medical therefore seeks equitable and injunctive relief to enjoin the Domson Defendants' conduct and prevent further irreparable damage to DC Medical pending its arbitration of those disputes with the AAA. The specific nature of injunctive relief requested is fully set forth in DC Medical's contemporaneously filed Motion for Temporary Restraining Order and Preliminary Injunction and Proposed Temporary Restraining Order.

## COUNT II – TORTIOUS INTERFERENCE
### (All Defendants)

142. DC Medical reasserts the preceding allegations as if fully set forth herein.

143. DC Medical has established business relationships, contractual and non-contractual, with its customers, medical facilities, and ordering physicians, which have been developed over a period of time (including, but not limited to, the Musculoskeletal Ambulatory Surgery Center, the Premier Surgery Center of Sarasota, the Lakewood Ranch Medical Center, the Doctors Hospital of Sarasota, and ordering physicians associated with those facilities including, but not limited to, Dr. Otte, Dr. Valadie, Dr. Silverstein, Dr. Thomas, Dr. Mahoney, and Dr. Lamar).

144. The Domson Defendants benefited from those relationships and goodwill DC Medical established with its customers, and had frequent material business contact with those customers and ordering physicians during their engagement with DC Medical (including, but not limited to, the Musculoskeletal

Ambulatory Surgery Center, the Premier Surgery Center of Sarasota, the Lakewood Ranch Medical Center, the Doctors Hospital of Sarasota, and ordering physicians associated with those facilities including, but not limited to, Dr. Otte, Dr. Valadie, Dr. Silverstein, Dr. Thomas, Dr. Mahoney, and Dr. Lamar).

145.   At all relevant times, Defendants had knowledge of these relationships, and Zimmer contracted with the Domson Defendants knowing that they obtained valuable business information about, and established goodwill with, these customers through their engagement with DC Medical, which could be used to promote, solicit, and sell competing medical devices to these customers on behalf of Zimmer.

146.   Upon information and belief, Zimmer further knew, at all relevant times, that the Domson Defendants were subject to restrictive covenants prohibiting them from engaging in certain competitive activities and/or solicitation activities, and did not take any action to ensure the Domson Defendants adhered to their obligations in that regard.  Zimmer has therefore knowingly interfered with DC Medical's contracts and business relationships with the Domson Defendants.

147.   The Domson Defendants knowingly engaged in competitive activities and solicitation activities with the above customers and ordering physicians in violation of the Agreement.

148.   Upon information and belief, Zimmer condoned and induced the Domson Defendants' competitive activities and solicitation activities with the above

customers and ordering physicians in violation of the Agreement and knowingly benefitted from the Domson Defendants' contractual violations.

149.   As such, Defendants have intentionally and without justification tortiously interfered with DC Medical's business and contractual relationships.

150.   Defendants' conduct described above far exceeds the bounds of fair and lawful competition, and Defendants had no lawful privilege or excuse for engaging in the unlawful conduct alleged herein.

151.   Defendants' unlawful conduct has proximately caused, and will continue to cause, DC Medical to suffer substantial and irreparable injury including, but not limited to, loss of customer relationships, loss of potential profits, harm to its reputation and goodwill, and loss of competitive advantage. The monetary value of these damages is impossible to calculate, and DC Medical has no adequate remedy at law or other means to address such injuries other than an award of injunctive relief.

152.   DC Medical will continue to suffer such irreparable injury unless the Court immediately enjoins Defendants from engaging in the above unlawful conduct.

153.   DC Medical therefore seeks equitable and injunctive relief to enjoin the Defendants' conduct and prevent further irreparable damage to DC Medical, pending its arbitration of those disputes with the AAA. The specific nature of injunctive relief requested is fully set forth in DC Medical's contemporaneously filed Motion for

Temporary Restraining Order and Preliminary Injunction and Proposed Temporary Restraining Order.

## PRAYER FOR RELIEF

DC Medical prays as follows:

B.      That the Court grant DC Medical's Motion for Temporary Restraining Order and, thereafter, injunctive relief to aid in arbitration; and

C.      That the Court award such other and further relief as it deems proper.

This 12th day of November, 2025.

TUCKER ELLIS LLP

*/s/ Christine A. Kurke*

Christine A. Kurke
FBN 1016172
christine.kurke@tuckerellis.com
3343 Peachtree Rd NE
Suite 1050
Atlanta, GA 30326
Telephone:  (404) 678-6364
Facsimile:   (404) 678-6380

*Counsel for Plaintiff DC Medical, LLC*